William Leroi, Appellant *v.* Civil Service Commission of the City of Philadelphia, Appellee.

Submitted on briefs, October 6, 1977, to Judges CRUMLISH, JR. and WILKINSON, JR., sitting as a panel of two.

*A. Charles Peruto,* for appellant.

*Gayle R. Smith,* Assistant to the City Solicitor, and *Sheldon L. Albert,* City Solicitor, for appellee.

OPINION BY JUDGE CRUMLISH, JR., February 28, 1978:

The Civil Service Commission of the City of Philadelphia (Commission/Appellee) ordered the dismissal of Appellant as a Philadelphia policeman. William Leroi (Appellant) appealed to the Court of Common Pleas which sustained the Commission's decision. Appellant now comes to us.

The charges against Appellant and those which form the basis for his dismissal are as follows: (1) association with one John Hutchins a/k/a Sundown (Hutchins), knowing of his criminal activity and failing to take proper action;[1] and (2) attempting to influence the actions of a fellow officer, Policeman Patrick Taylor (Taylor), in the investigation and arrest of Hutchins. Appellant was found guilty of Conduct Unbecoming an Officer[2] and was dismissed on February 16, 1973. No criminal charges were filed.

The following factual presentation serves as the genesis of this controversy.

Appellant was, until his dismissal, a 15-year veteran policeman assigned to the Police Radio Room.[3] Over a period of approximately 12 years Hutchins was an informant of Appellant. Taylor, then a two-year veteran, was assigned to sector patrol in the 25th Police District. He had been acquainted with Hutchins for approximately eight months.

The record shows that, upon information received from an informant, Taylor suspected Hutchins of dealing in drugs and commenced an investigation. Shortly thereafter, Taylor was approached by Appellant and the following conversation, as related by

---

[1] Hutchins has a police record dating back to 1947, including nine arrests between that date and 1972, for various offenses including larceny, burglary, illegal possession of narcotics, and assault with intent to kill.

[2] Conduct unbecoming an officer justifying dismissal is any conduct adversely affecting the morale or efficiency of the bureau or department to which he is assigned or conduct which has a tendency to destroy public respect for municipal employes or confidence in the operation of municipal services. See *Albano v. Civil Service Commission of the Borough of McAdoo*, 13 Pa. Commonwealth Ct. 333, 320 A.2d 385 (1974).

[3] Appellant was transferred from the 22nd Police District and assigned to the Police Radio Room in February, 1969.

Taylor at the Police Board of Inquiry Hearing, ensued:

Q.  Officer, on November 14, 1972 were you at City Hall?

A.  Yes, I was.

Q.  Will you go on and tell the Board what occurred during recess at that time?[4]

· A.  Yes, officer Ringgold and myself . . . were having a conversation over coffee when [Appellant] approached me and asked me to speak with him. I said 'Sure.' He started by saying, 'I understand you're leaning on a friend of mine pretty hard.' I said, 'Whose [sic] that?' He said, '[Hutchins]. I was talking to him and he said that you've been pretty hard on him.' I said 'What do you mean?' He said, 'You have been leaning on him; you've been pretty hard on him. *You can talk to him and he'll take care of you.*' I didn't say anything because I didn't understand what he meant. Then he said, *'He's a friend of mine. If you talk to him, he'll do right by you.'* At this time I said, 'Do you know what [Hutchins] is involved in?' He said, 'No, nothing that I know of.' (Emphasis added.)

Appellant's recount of his conversation with Taylor differs and is as follows:

A.  I do remember the conversation. About a month prior to that conversation, I was going home after a day work tour when I saw Sundown near his residence on Glenwood Avenue. I pulled over when he waved me down and we started to talk. During the course of the con-

---

[4] Appellant and Policeman Taylor were attending separate trials concerning prior arrests.

versation, he told me that a [Policeman] Taylor was harrassing [sic] him and asked me to speak to Taylor about the harassment. He stated he was in legitimate business doing odd jobs in the area and that he employed three men in his business. I told him if he was legitimate and was being harassed, that he should go and see [Policeman] Taylor's Commanding Officer and that the Captain would straighten it out for him. He asked me if I knew Taylor and I told him I thought I did and I told him of a minor argument we had at the Police Academy some time previous. I told him because of the argument I would rather not speak to Taylor and again told him to speak to his Captain as this was the proper thing to do. He again asked me to speak to Taylor if I should happen to see him and I told him I would and I saw Taylor on the date in question while I was in court. In the conversation with Taylor I told him that Hutchins had told me he was being harassed by him (Taylor) and told him that to the best of my knowledge that this man was legitimate and a decent person. Taylor then outlined to me that Hutchins was a dope pusher in the North [Philadelphia] area and that he should be arrested. He went on to state that Hutchins had been attempting to give him money and that he was going to report it to the Staff Inspectors so he could set up Hutchins so that he would be arrested. I told him then that if he was doing something illegal, he should certainly try to arrest him and do whatever he could and that if Hutchins had tried to bribe him it should be reported to the Staff Inspectors so that Hutchins could be arrested for bribery.

Q. Did you ever make a statement to [Policeman] Taylor such as, 'I (meaning you) understand you have been leaning on my friend John Sundown. He is an old friend of mine,' and other statements to Taylor relating that you had been talking to Sundown and that Sundown had told you that he would make it worth Taylor's while if Taylor would leave him alone?

A. I made a statement to Taylor that if he really wanted to make a lot of vice pinches, that he would go talk to Sundown and more or less try to confer with the man because he was always good for a source of information where I had worked prior in the 22nd., and that I'm sure if they could come to some sort of understanding between each other that Sundown would cooperate with him in every way he could.

Q. Did you use the words 'he would take car [sic] of you'?

A. Not that I recall.

Officer Taylor reported the conversation to his superiors who instructed him to contact Hutchins. During a subsequent conversation, Hutchins offered Taylor a bribe, whereupon he was arrested. Following an investigation, Appellant was discharged.

Appellant contends that the Commission's decision was not supported by substantial evidence, that the Commission erred in accepting testimony of the alleged bribe offer to Taylor, and that Appellant's statement to the Police Board of Inquiry (Board) was made under duress and hence it was tainted. We shall deal with each assertion seriatim.

As to Appellant's first argument on the issue of substantial evidence, his contention is that, although the record establishes that he was professionally acquainted with Hutchins, it is devoid of his knowledge

of Hutchins' police record or, for that matter, that Hutchins was in fact a known criminal.

Substantial evidence supports an administrative decision when, from an examination of the entire record and inferences therefrom, a reasonable man might have reached the same decision. *See St. Andrews Development Co. v. Pennsylvania Human Relations Commission*, 10 Pa. Commonwealth Ct. 123, 308 A.2d 623 (1973). A public employer need not prove beyond a reasonable doubt that an employee committed a crime or that he was convicted of a crime to justify action of suspension or removal, but need present only such evidence as is sufficient to support the conclusion that the suspension or removal was for just cause. *See Hughes v. State Civil Service Commission*, 17 Pa. Commonwealth Ct. 344, 331 A.2d 590 (1975).

The record tells us that Appellant's police work nurtured a 12-year association with Hutchins during which Hutchins acted as an informant, that Hutchins had a police record spanning a 25-year period, and that following the conversation between Appellant and Taylor wherein Appellant said to Taylor, "[y]ou can talk to [Hutchins] and he'll take care of you," Taylor was offered a $50.00 bribe by Hutchins.

The Commission decided that Appellant's familiarity with Hutchins' criminal conduct was a credibility issue and it concluded that Taylor's testimony was more credible. It is well established that questions of credibility arising in a Civil Service Commission hearing are to be determined by the Commission, and that a reviewing court may not substitute its conclusions in reviewing the Commission. *See Gallagher v. Civil Service Commission of the City of Philadelphia*, 16 Pa. Commonwealth Ct. 279, 330 A.2d 287 (1974). We are satisfied that the record and the inferences drawn therefrom support the Commission's findings.

Appellant next argues that the Commission erred in considering testimony relating to Hutchins' bribe offer because that testimony was not relevant to the charges against him and therefore was unduly prejudicial. We disagree. It is well established that evidence is relevant when it tends to establish the facts in issue. *See Gregg v. Fisher,* 377 Pa. 445, 105 A.2d 105 (1954). That Taylor was offered a bribe by Hutchins within one month following his conversation with Appellant makes it more probable than not that Appellant was attempting to influence Taylor's investigation and that knowledge of Hutchins' criminal conduct must be imputed to him. It is clear that Taylor had had numerous contacts with Hutchins prior to his conversation with Appellant and up to that point he had not been offered a bribe.[5]

Finally, Appellant argues that the Commission erred in accepting his testimony as required by Section 10-110 of the Philadelphia Home Rule Charter (Charter)[6] because it was not a voluntary expression. We find this contention to be totally without merit.

---

[5] During the month between Hutchins' bribe offer and Taylor's conversation with Appellant, Taylor had spoken to Hutchins on approximately four occasions.

[6] Section 10-110 of the Charter states in relevant part:

*Refusal to Testify:* If any officer or employee of the City shall wilfully refuse or fail to appear before any . . . board . . . authorized to conduct any hearing or inquiry, or having appeared, shall refuse to testify or to answer any question relating to the affairs or government of the City or the conduct of any City officer or employee on the ground that his testimony or answers would tend to incriminate him, or shall refuse to waive immunity from prosecution on account of any matter about which he may be asked to testify . . . at any such hearing or inquiry, he shall forfeit his office or position, and shall not be eligible thereafter for appointment to any position in the City service.

Section 10-110 of the Charter was declared unconstitutional by the Pennsylvania Supreme Court in *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975), three years after Appellant's Board appearance. In *Triplett*, a police officer made self-incriminating statements which were later used in a criminal proceeding against him. The Supreme Court, citing the Charter requirements, found that the statements were not a product of the accused's free will. In a Concurring Opinion, Justice POMEROY wrote, "[t]he issue in each instance is whether the admissions which succeed the Miranda warnings are 'sufficiently an act of the free will' of the accused." 462 Pa. at 252, 341 A.2d at 65.

Appellant, knowing of the Charter provisions, stated that he wanted to make a statement and answered in the affirmative when questioned whether he was willing to answer inquiries freely.[7] In his statement, Appellant made no admissions or other self-incriminating remarks. He merely recited his version of the incident. That his statement was found less credible than that of Policeman Taylor does not render it involuntary and inadmissible.

Accordingly, we

ORDER

AND Now, this 28th day of February, 1978, the order of the Court of Common Pleas of Philadelphia County is affirmed.

---

[7] At the outset of inquiry before the Board, Appellant was given his *Miranda* warning and asked several questions, among which were the following:

Q. Do you want to remain silent?

A. No, I want to make a statement.

Q. Are you willing to answer questions of your own free will, without force, and without any threats or promises having been made to you?

A. Yes. . . .