399 A.2d 353

**COMMONWEALTH of Pennsylvania**

v.

**Clarence STARKS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 8, 1979.

Decided March 14, 1979.

400

402

Paul Leo McSorley, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty., Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

O'BRIEN, Justice.

Appellant, Clarence Starks, was tried by a judge sitting with a jury in connection with the homicide of Jeremiah Middleton. The homicide occurred on January 25, 1974. The jury returned a verdict of murder of the first degree, criminal conspiracy, carrying a firearm on a public street or public property and unlawfully carrying a firearm without a license. Post-verdict motions were denied. The court below imposed the following judgments of sentence: life imprisonment on the murder conviction, five to ten years imprisonment on the conspiracy conviction and two separate two and one-half to five year prison sentences on the weapons violations. All of the sentences were to be concurrent. Appellant filed a direct appeal to this court from the judgment of

sentence imposed on his conviction for murder in the first degree.

Appellant first argues that the court below erred in failing to suppress two statements given to the Philadelphia police. The basis for the suppression is Pa.R.Crim.P. 130 and this court's decision in *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972). We do not agree.

Pa.R.Crim.P. 130 provides:

"Rule 130. Procedure in Court Cases Initiated By Arrest Without Warrant.

"When a defendant has been arrested without a warrant in a court case, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him and he shall be given an immediate preliminary arraignment. Rule 118 (in part) adopted January 31, 1970, effective May 1, 1970; renumbered as Rule 130 and amended September 18, 1973, effective January 1, 1974."

In *Commonwealth v. Williams*, 476 Pa. 344, 382 A.2d 1202 (1978) this court reiterated the three-prong test for admissibility:

"In *Commonwealth v. Williams* [455 Pa. 569, 319 A.2d 419 (1974)], we established a three-pronged test to determine if a statement obtained during a pre-arraignment delay must be suppressed: (1) the delay must be unnecessary; (2) the evidence must be prejudicial; and (3) the evidence must be reasonably related to the delay.[2]

"[2] In *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), we modified the *Futch* rule and held that unless a defendant is arraigned within six hours, any statement obtained between arrest and arraignment shall not be admissible. *Davenport*, however, applies only to arrests made after May 15, 1977."

The standard of review for judging the correctness of a suppression court determination is:

". . . Our responsibility on review is 'to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings.' *Commonwealth v. Goodwin*, supra, 460 Pa. at 521, 333 A.2d at 895; see

*Commonwealth v. Bundy,* 458 Pa. 240, 328 A.2d 517 (1974). In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. See *Culombe v. Connecticut,* supra, 367 U.S. at 604, 81 S.Ct. at 1878; *Commonwealth v. Goodwin,* supra, 460 Pa. at 521, 333 A.2d at 895; *Commonwealth ex rel. Butler v. Rundle,* supra, 429 Pa. at 149–50, 239 A.2d at 430." *Commonwealth v. Kichline,* 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976).

In *Commonwealth v. Willis,* 483 Pa. 21, 394 A.2d 519 (1978), this court further defined the standard:

"First, the standard of review [*Kichline* standard] which we are asked to apply is that which is used '*[w]here there are no explicit findings, or in the case of lacunae among the findings.*' *Commonwealth v. Sparrow,* 471 Pa. 490, 498 n.5, 370 A.2d 712, 716 n.5 (1977). [Emphasis in original.] . . . We are bound to accept such explicit findings of fact unless they are wholly lacking support in the evidence. *Commonwealth v. Sparrow,* supra, 471 Pa. at 498 n.5, 370 A.2d at 716 n.5." (Footnote omitted.)

In the instant case, the suppression court made specific findings of fact and, therefore, we are bound by such findings "unless they are wholly lacking support in the evidence."

The facts in the instant case are as follows. On January 25, 1974, at approximately 9:25 a. m., an automobile in which appellant was riding was stopped for a traffic violation. The police officer observed appellant alone in the rear seat of the automobile, attempting to conceal a revolver. The officer then retrieved the weapon, a loaded .32 caliber Smith & Wesson. Appellant was arrested on a weapons charge. He was then transported to the police station at Twentieth and Federal. Shortly thereafter, appellant was moved to the South Detective Division at Twenty-fourth and Wolf Streets. He was again moved to the Homicide Unit at the Police Administration Building, arriving at 11:12 a. m. Ap-

pellant was placed in an interrogation room and was left alone until 12:30 p. m., when he was offered lunch, which he refused. However, he did avail himself of the bathroom facilities and had a drink of water. Appellant was then left alone again until 1:45 p. m., when Detective David Porter, the supervising police officer, warned appellant of his *Miranda* rights and advised him that he was under arrest for the shooting of Jeremiah Middleton. Appellant waived his rights and agreed to make a statement. This interrogation and statement lasted until 3:17 p. m. Appellant disavowed any knowledge of the Middleton homicide and stated that he was at his girlfriend's home, in bed. He also stated that Carol Chandler, his girlfriend, her mother, and a Mr. Gardner were also present in the house. He went on to discuss his unsuccessful attempt to secure a prescription for a cough syrup. He stated that he did not leave his girlfriend's house until 8:45 or 9:00 a. m., approximately forty-five minutes to one hour after the Middleton homicide. At the end of the interrogation, appellant consented to a polygraph test.

At 3:21 p. m., appellant was fed and left alone until 4:07 p. m., when the police escorted him to the polygraph testing room. Prior to the test, appellant denied any complicity. The test lasted until 5:30 p. m. At 5:30 p. m., appellant was informed by the interrogating officers that he had flunked the polygraph test. The police then conducted a second interrogation, which lasted until 7:20 p. m. Appellant's statement that was reduced to writing was in all important aspects completely consistent with his previous denials of complicity. Appellant unequivocally stated that he was not at the scene of the Middleton shooting, and that at the time of the shooting, he was at 1225 Bainbridge Street, his girlfriend's home, which he did not leave until 8:45 to 9:00 a. m. He did admit that he was a member of a gang known as "Black Brothers, Inc." (BBI), and that BBI was presently "warring" against the 19th Carpenter Street Gang. The purpose of the "war" was the secession of certain BBI members. Subsequent questioning occurred, but no statements were given to the police. Appellant was arraigned at

approximately 5:00 p. m., on January 26, 1974, thirty-two hours after his arrest.

At trial, both statements were introduced as part of the Commonwealth's case in chief, and as part of Detective Porter's testimony.

Initially, we note that in our inquiry into unnecessary delay in arraignment we will concern ourselves with the time between 9:25 a. m. and 7:20 p. m. of January 25, 1974. During the remaining time, no statements of any nature were obtained. *Commonwealth v. Rowe*, 459 Pa. 163, 327 A.2d 358 (1974).

Turning to the facts of the instant case, appellant was arrested on January 25, 1974, at 9:25 a. m., on an unrelated traffic violation. He was transported to two local police stations before arriving at the Police Administration Building Homicide Unit at 11:12 a. m. The transportation time is properly excluded from consideration for purposes of a *Futch* analysis. *Commonwealth v. Coley*, 466 Pa. 53, 351 A.2d 617 (1976).

From 11:12 a. m. until 12:30 p. m., appellant was alone and handcuffed in an interrogation room. At 12:30 p. m., police inquired of appellant whether he wanted food, water and use of the men's room. Appellant refused the food, but did avail himself of the other facilities. At 1:45 p. m., Detective Porter informed appellant of his *Miranda* rights and told him that he was being questioned in connection with the Middleton shooting. The 1:45 p. m. interrogation session lasted until 3:17 p. m., approximately one and one-half hours. The statement given was completely exculpatory, as detailed above.

As to this statement, we find that (1) it was given within four and one-half hours (11:12 a. m. to 3:17 p. m.) after his arrival at the police station; (2) that during the four and one-half hours appellant was only questioned for one and one-half hours, being either alone or using the facilities for the remaining three hours; and (3) that the statement given between 1:45 p. m. and 3:17 p. m. was

completely exculpatory. Under these circumstances, we find no violation of Pa.R.Crim.P. 130 or our decision in *Futch. Commonwealth v. Williams*, 476 Pa. 344, 382 A.2d 1202 (1978) and *Commonwealth v. Young*, 460 Pa. 598, 334 A.2d 252 (1975).

■ Appellant was fed at 3:21 p. m., and at 4:07 p. m., he was given a polygraph test, which was completed at 5:30 p. m. Appellant was told that he had flunked the test and was again interrogated until 7:20 p. m. During the time from 3:17 p. m. until 7:20 p. m.—four hours—appellant was given a polygraph test and interrogated for approximately three and one-half hours. The statement that was the product of this polygraph test/interrogation was again exculpatory, when asked specific questions about the Middleton homicide. The only new information which appellant gave was that he was a member of BBI and that BBI was at war with the 19th Street Carpenter Gang. He stated that BBI was a social organization and that it did not extort money. We believe that this second statement was not prejudicial to appellant.

The first portion of the second statement reaffirmed his denial of complicity in the Middleton shooting and also restated his alibi. The addition of appellant's admission of membership in BBI was a fact already known to the police. Moreover, the fact of membership did not incriminate appellant in the Middleton shooting, especially in light of appellant's specific and consistent denials of involvement in the shooting. In summation, as both statements were exculpatory in nature, we find no violation of Pa.R.Crim.P. 130 or *Commonwealth v. Futch, supra.*

■ Appellant next argues that the court below erred in not granting a mistrial during the testimony of Detective Porter. We find no reversible error. The complained of portion of the testimony is as follows:

"Q. On the first page at the top of C–5, the word 'Geech' appears. What does that relate to?

"A. That is the defendant's nickname, Geech.

"Q. How did you know that?

"A. *I know that from other contacts with the defendant.* (Emphasis supplied.)

"MR. ACKERMAN: Objection, your Honor.

"THE COURT: Sustained.

"MR. ACKERMAN: May we have a cautionary instruction.

"THE COURT: Ladies and gentlemen, there may have been numerous ways in which Detective Porter had had prior contact with the defendant which he had discovered his nickname. It might possibly be that Officer Porter discovered his nickname by people other than the defendant. We are not certain what his source of information is as to the nickname, if correct, was obtained. The guilt or innocence of this defendant of course, is to be determined by reference to no collateral matters and no other kinds of unrelated alleged acts or possible acts or any conjecture or possible guesses to any unrelated acts. His guilt or innocence, as I said in my preliminary instructions, and I will repeat in my final charge, most certainly are to be determined on the basis of the evidence presented here at this trial relevant to the issues that are presented at this trial. All right."

A short recess was then taken. During the recess, defense counsel made a motion for a mistrial, based upon the above-emphasized testimony. The basis of the objection and the motion for a mistrial was defense counsel's contention that the emphasized testimony violated this court's mandate in *Commonwealth v. Allen*, 448 Pa. 177, 292 A.2d 373 (1972). We do not agree.

In *Commonwealth v. Riggins*, 478 Pa. 222, 386 A.2d 520 (1978), this court stated:

". . . As we stated in *Commonwealth v. Banks*, 454 Pa. 401, 411, 311 A.2d 576, 581 (1973), 'To warrant a characterization as prejudicial the testimony must convey to the jury, either expressly or by reasonable implication, the fact of a prior criminal offense.'

"The detective's passing inference in this case to the fact that he knew where appellant lived cannot reasonably be said to have given the jury the impression that appellant must have been involved in prior criminal activity. This testimony is not comparable to the repeated references to police photographs of a defendant in *Commonwealth v. Allen*, 448 Pa. 177, 292 A.2d 373 (1972). Nor is it analogous to the police officer's statement that the defendant had previously served time in prison in *Commonwealth v. Clark*, 453 Pa. 449, 309 A.2d 589 (1973). In both *Allen* and *Clark* we reversed convictions because the testimonial references reasonably conveyed the impression that the defendants in those cases had engaged in prior crimes. To conclude that appellant had committed prior crimes from a detective's single statement that he knew where appellant lived, the jury would have to indulge in gross speculation. Accordingly, the trial court did not err in denying this motion for mistrial."

We are of the opinion that the testimony of Detective Porter does not expressly or by reasonable implication convey the impression of prior criminal activity so as to require a mistrial.

Appellant's final argument is framed in terms of three incidents revolving around the testimony of Loretha Ford, an eyewitness. Appellant argues that "overwhelming violations of due process" occurred at his trial when consideration is given the following three instances, coupled with his allegation of a *Futch* violation. Appellant states that none of the three is sufficient within itself to merit relief, but contends that the three combined with the alleged *Futch* violation require relief. He requests a new hearing.

■ Appellant first argues that the court below denied the defense access to Commonwealth witness Loretha Ford. We do not agree. Loretha Ford was an eyewitness to the Middleton slaying. Ford was fearful for her safety. Because of this fear, the district attorney received permission to list the Ford address as 666 City Hall and the defense could contact her at that address. Permission was given at

appellant's preliminary hearing. Defense counsel did not object to this procedure and did not seek to interview Ford until moments before her trial testimony. At that time, defense counsel requested permission to interview Ford. The court granted the request, subject to the district attorney's being present. After a short time, both defense counsel and the district attorney returned to the courtroom. Defense counsel complained that the district attorney was exerting undue influence over Ford. The district attorney denied this allegation. The court then called the witness before the bench and the following colloquy took place:

"THE COURT: Miss Ford, I have called you in because I wanted to explain something to you and I wanted to make sure that the record clearly reflects what it shows, the record shows what your decision has been with respect to whether or not you want to be interviewed by or talk to the defendant's lawyer. You understand that? I was not present at the conference at which you just attended in the presence of the District Attorney and the defendant's attorney. You understand that?

"LORETHA FORD: Yes.

"THE COURT: I wanted to make sure that I didn't have—I don't want to use big legal words. I do not want to put my two cents in. I wanted the thing to be neutral, fair and square when the defendant's attorney met you. You understand that?

"LORETHA FORD: Yes.

"THE COURT: But I must indicate for the record now, number one, whether or not he was accorded an opportunity to speak to you. He was given that opportunity to speak to you, was he not?

"LORETHA FORD: Was he what?

"THE COURT: He was given an opportunity to speak to you in my absence about two minutes ago in this room, wasn't he? Is that correct?

"LORETHA FORD: Yes.

"THE COURT: And the District Attorney was here? Is that correct?

"LORETHA FORD: Yes.

"THE COURT: And Mr. Ackerman, the defendant's attorney was here at that time. Is that correct?

"LORETHA FORD: Yes.

"THE COURT: In any event, you came in and he was given a chance to ask you whether or not you wanted to talk to him. Is that right?

"LORETHA FORD: Yes.

"THE COURT: Now, do you understand that it is your own mind and your own will and your own decision as to whether or not you want to be interviewed and be spoken to and to discuss what you observed with the defendant's attorney. Do you understand that?

"LORETHA FORD: Yes.

"THE COURT: You can decide for yourself. You owe no obligation to the commonwealth and you owe no obligation to the Court and you owe no obligation to the defense counsel. It is your decision as to whether or not you want to cooperate and grant an interview to the defendant's attorney. You understand that?

"LORETHA FORD: Yes.

"THE COURT: Now, do you want to talk to and give an interview or discuss what your testimony is with the defendant's attorney?

"LORETHA FORD: No.

"THE COURT: Has the District Attorney indicated to you either way what your decision should be?

"LORETHA FORD: No.

"THE COURT: Whose decision has it been that you decided not to talk to the defendant's lawyer?

"LORETHA FORD: Mine.

"THE COURT: Is there any chance that you would change your mind?

"LORETHA FORD: No."

We find no error in the above procedure. See *Commonwealth v. Johnson*, 457 Pa. 554, 327 A.2d 632 (1974).

412

■ The second prong of appellant's argument is that the court erred in not inquiring of the district attorney how he had "subpoena" power to compel Loretha Ford to come to his office after trial. The facts surrounding this argument are as follows.

Appellant filed a post-verdict motion alleging that Loretha Ford had recanted her trial testimony. Subsequent to the filing of the motion, the district attorney sought to have Ford taken to the district attorney's office. Ford went to the district attorney's office twice—once for an interview on June 2, 1976, and the second time on the following day to sign a statement renouncing her recantation and affirming her trial testimony. On June 10, 1976, a hearing was held on appellant's allegation that Ford had recanted her trial testimony. Defense counsel was permitted to question Ford on the existence of the subpoena and its contents. Counsel was also not inhibited from cross-examining the district attorney's detective as to the subpoena. Appellant alleges no harm or prejudice occurring to him by way of the subpoena other than to argue "paternalism." We find no error.

■ The final allegation of error concerns the trial court's refusal to hold an evidentiary hearing. The hearing was requested by appellant for the purpose of placing Loretha Ford on the stand at the sentencing hearing. Appellant claims that Ford would disavow her renunciation of her recantation of her trial testimony.

In *Commonwealth v. Nelson,* 484 Pa. 11, 398 A.2d 636 (1979) (J63 of 1979), we stated:

"Recantation testimony is considered extremely unreliable. The trial court is to deny a new trial unless satisfied that the recantation is true and an appellate court is not to disturb the decision unless there is clear abuse of discretion. *Commonwealth v. Coleman,* 438 Pa. 373, 264 A.2d 649 (1970). It is up to the trial court to judge the credibility of the recantation. *Commonwealth v. Sanabria,* 478 Pa. 22, 385 A.2d 1292 (1978). . . ."

We find no abuse of discretion in the court's refusal to hold a hearing.

Judgment of sentence affirmed.

EAGEN, C. J., and NIX, J., concur in the result.

ROBERTS, J., files a dissenting opinion.

MANDERINO, J., dissents.

ROBERTS, Justice, dissenting.

The plurality assumes the role of a jury and finds that evidence introduced by the Commonwealth against the defendant was not inculpatory. On this basis, the plurality concludes that it need not address the question of whether a statement taken ten hours after arrest and in the absence of any preliminary arraignment violates the mandate of *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972) and Pa.R.Crim.P. 130. I dissent. I cannot agree that the Commonwealth introduced exculpatory admissions. The defendant demonstrated sufficient harm to preserve his claim when he established that the Commonwealth introduced his admission into evidence against him at his trial. Thus, I would consider the defendant's *Futch* claim on the merits.

Inexplicably, the plurality argues, in addition, that the defendant was given an adequate opportunity to interview a witness when the defendant was limited to conducting his interview in City Hall in the presence of the district attorney. I cannot agree.

Finally, the plurality disavows the existence of any improper implication where a police officer states that he knew the defendant's nickname because of "other contacts" with the defendant. I disagree. This testimony is most plausibly viewed as a reference to the defendant's prior criminal activity. Thus, this Court should address the question of whether the trial court's cautionary instruction was sufficient to cure the prosecution witness' implicit reference to the defendant's prior criminal activity. See *Commonwealth v. Spruill*, 480 Pa. 601, 391 A.2d 1048 (1978).