425 A.2d 1151

**COMMONWEALTH of Pennsylvania**

v.

**David THOMAS, Appellant.**

Superior Court of Pennsylvania.

Submitted June 29, 1979.

Filed Feb. 13, 1981.

A. Charles Peruto, Philadelphia, for appellant.

Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before PRICE, GATES and DOWLING, JJ.*

GATES, J.:

Appellant, David Thomas, a Philadelphia Police Officer, was tried by a judge sitting without a jury and found guilty of simple assault[1], aggravated assault[2], criminal conspiracy[3], and possession of an instrument of crime[4]. Post-verdict motions were denied and appellant was sentenced to a four year probationary term.

The facts surrounding this appeal are as follows: On July 5, 1977, at or about 6:30 p. m., appellant's sister, Marva Crafton[5], was assaulted near her residence by Joseph Smith. Following this attack, Ms. Crafton telephoned her brother, the appellant, who is a Philadelphia Police Officer, not then on duty. She told him about the incident. Appellant immediately went to his sister's house and saw that she was bruised and upset.

---

* President Judge G. THOMAS GATES of the Court of Common Pleas of Lebanon County, Pennsylvania, and Judge JOHN C. DOWLING of the Court of Common Pleas of Dauphin County, Pennsylvania, are sitting by designation.

1. 18 Pa.C.S. § 2701.

2. 18 Pa.C.S. § 2702.

3. 18 Pa.C.S. § 903.

4. 18 Pa.C.S. § 907.

5. Marva Crafton was a co-conspirator and co-defendant at trial.

Smith returned to the Crafton home a short while later [6]. Smith was unarmed as he entered the house. Appellant was hiding behind the front door, armed with a police service revolver and a blackjack. Smith was shot and struck with the blackjack during the ensuing scuffle. Smith fled the scene and sought emergency treatment at a nearby hospital.

On July 5, 1976 Captain James Murray of the Philadelphia Police Narcotics Squad went to the scene of the shooting at about 8:15 p. m. There he found the appellant and his sister. His investigation disclosed that Officer Thomas had fired some shots and, as a result, he was ordered to go downtown and report to the Police Administration Building for the purpose of giving a statement. When Officer Thomas demurred and asked if he could go down to the Police Administration Building the next day, Captain Murray told him: "Don't you understand that you have to give a statement? You are involved in some activity here, and I have to investigate this under the City Charter, under 10–110 Section . . . I said I have to get this done this evening." [7] This was the only reference to the City Charter provision and Officer Thomas was not subjected to the litany of the "charter warnings" condemned in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) and *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975).

At this time Captain Murray did not suspect appellant of any criminal activity. However, the Captain felt his statement was necessary to the investigation because of his involvement in the incident and because a police revolver was used. At this point in the investigation it appeared to Captain Murray that Marva Crafton was assaulted by Joseph Smith, and that Joseph Smith in turn was shot by the

**6.** The Commonwealth's evidence supported the theory that appellant and his sister "set up" Smith for this brutal assault. Smith testified that he went to Ms. Crafton's house at her request. After Smith was lured into the house, he was attacked by appellant who was armed with a gun and a blackjack. Appellant shot Smith and hit him across the head and eyes with a blackjack as he lay helpless on the ground.

**7.** N.T. Suppression Hearing 27–8.

380

defendant, Officer Thomas. At the time Thomas was not the focus of any criminal investigation.

Later in the evening, at about 11:00 p. m. on July 5, 1976, Captain Murray saw appellant at the Police Administration Building. Appellant had been allowed to make a telephone call to the Fraternal Order of Police. His attorney, Mr. Bernstein, had been summoned to the Police Administration Building to represent the defendant, and had conferred with him. Appellant was given free access to the building and was permitted to move about unescorted. However, subsequent to the passing reference to the City Charter, Captain Murray learned that appellant may have been involved in criminal activity. He told appellant's attorney that there was a possibility that his client would be arrested. The Captain told appellant's attorney that he wanted a statement from the appellant. After speaking with his attorney, appellant raised no objection to giving a statement to Captain Murray. When appellant became aware that he might be criminally charged, he volunteered, saying "Wait a minute. Let me get this together. I want to tell you my side." [8] Before any statement was taken from appellant he was advised of his *Miranda* rights. Appellant appeared normal and understood what was going on. At about 1:45 a. m. he gave an oral statement [9]. The statement was subsequently reduced to writing and signed by the appellant. The appellant was permitted to go home and was not arrested until the next day.

Prior to trial, appellant filed a suppression motion on the grounds that the statement given by him was involuntary as the result of the coerciveness of the reference to the City Charter provision.

The suppression hearing judge, after a three-day suppression hearing, found that the statement was voluntary and was not the product of any coerciveness resulting from the

8. N.T. Suppression Hearing 46.

9. N.T. Suppression Hearing 24.

passing reference to the City Charter provision.[10]   No statement was taken from appellant until after he was fully advised of his *Miranda* warnings.

The appellant's statement, though inculpatory, was used by the Commonwealth during the trial.

This appeal requires us to determine the validity of the suppression hearing judge's finding that the statement was voluntarily given and, therefore, not suppressible.

Before venturing further, we must examine some basic principles.  At a suppression hearing, where the voluntariness of an accused's statement is the issue, the burden of proof is upon the Commonwealth to demonstrate, not beyond a reasonable doubt, but by a preponderance of the evidence that the challenged statement was given voluntarily.  *Commonwealth ex rel. Butler v. Rundel,* 429 Pa. 141, 239 A.2d 426 (1968).   The suppression judge who hears and evaluates the testimony is required to make findings of fact and conclusions of law and we should be deferent to those findings.   Pa.R.Crim.P. 323(i);  *Commonwealth v. Jackson,* 464 Pa. 292, 346 A.2d 746 (1975).   It is the responsibility of the suppression hearing court to determine whether the Commonwealth has established by a preponderance of the evidence that the statement was voluntary and that the waiver of constitutional rights was knowing and intelligent.  *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974).   On appellate review, it is our responsibility to "determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings."  *Commonwealth v. Goodwin,* 460 Pa. 516 at 522, 333 A.2d 892, at 895 (1975).   In making this determination, we will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.  *Commonwealth v. Goodwin,* supra.

**10.**   N.T. Suppression Hearing 124–128.

■ Applying these standards to this case we conclude that the statement was voluntary and the waiver, following the *Miranda* warnings, was knowing and intelligent.

Initially we note that the appellant was not under arrest and there was no "custodial interrogation" such as that which concerned our United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The interrogation took place at the Police Administration Building, which certainly is not an unfamiliar surrounding for a police officer such as the appellant. During the time he was there he was free to go to the cafeteria to get coffee. He made a telephone call to the Fraternal Order of Police. He summoned his attorney and spoke with him prior to the time the statement was elicited from him. When appellant became aware that he might be criminally involved, he volunteered to make a statement. The statement was made in the presence of his attorney and appellant appeared normal and understood what was going on. Before any statement was taken from the appellant he was advised of his *Miranda* rights. The statement was reduced to writing, signed by the appellant and he was permitted to go home and not arrested until the following day.

We acknowledge that there is no single litmus paper test for determining the voluntariness of a statement, yet we recognize that it must be established that the decision to speak was the product of the free and unconstrained choice of its maker. *Commonwealth v. Ritter*, 462 Pa. 202, 340 A.2d 433 (1975). When considering all of the surrounding circumstances leading to the appellant's giving of the statement, we agree with the suppression hearing judge that it was voluntary.

Appellant, argues, however, that the question of voluntariness involves a degree of psychological coercion occasioned by Captain Murray's prior reference to the City Charter provision [11]. In support of his position the defendant relies

11. Section 10–110 of the Philadelphia Home Rule Charter reads as follows:

on *Garrity v. New Jersey,* supra, and *Commonwealth v. Triplett,* supra.

In *Garrity v. New Jersey,* supra, before the appellant was questioned he was warned (1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office. Significantly, the appellant here was never told that if he did not give a statement he would be subject to removal from office.

In *Commonwealth v. Triplett,* supra, immediately before the interrogation of the police officer began, his superiors gave him the "charter warnings" which consisted of: "I wish to inform you that this is an official investigation, and under the provisions of the Philadelphia Home Rule Charter, Section 10–110 you are required to cooperate fully and answer all questions. Do you understand?" *Commonwealth v. Triplett,* 462 Pa. 246–247, 341 A.2d 62. Furthermore, in *Triplett,* the interrogating superior testified that Triplett, through his police training, was completely familiar with Section 10–110 of the Philadelphia Home Rule Charter and the consequences of a police officer's failure to answer the questions posed to him. We allow that it is a permissible inference that the appellant in the instant case might have been, by inference at least, aware of the City Charter provision. It is an equally permissible inference that he was aware that the "charter warnings" were condemned as

"If an officer or employee of the City shall willfully refuse or fail to appear before any court, or before the Council or any committee thereof, or before any officer, department, board, commission or body authorized to conduct any hearing or inquiry, or have appeared, shall refuse to testify or to answer any question relating to the affairs or government of the City or the conduct of any City officer or employe on the ground that his testimony or answers would tend to incriminate him or shall refuse to waive immunity from prosecution on account of any matter about which he may be asked to testify before such court or at any such hearing or inquiry, he shall forfeit his office or position, and shall not be eligible thereafter for appointment to any position in the City service."

unconstitutional in *Garrity v. New Jersey,* supra, nearly ten years before this incident and, particularly, in *Commonwealth v. Triplett,* supra, decided fully two years before the incident under scrutiny. This latter inference finds support and is buttressed by the fact that Captain Murray did not tell appellant that he had to make a statement or he would lose his job.

Significantly, appellant did not make any statement after Captain Murray made reference to the City Charter provision nor before hearing the *Miranda* liturgy. Therefore, the post-*Miranda* warning statement condemned in *Commonwealth v. Triplett,* supra, cannot be held to be tainted as was the statement in *Commonwealth v. Ware,* 438 Pa. 517, 265 A.2d 790 (1970).

In summary, we agree with the suppression hearing judge that the preponderant evidence was that the statement was freely and voluntarily given and it was preceded by the *Miranda* fiat. Consequently, it was not suppressible and its use at trial not error.

Next, appellant contends that it was error to allow the District Attorney to attempt to impeach his testimony by utilizing a statement given by appellant to Officer Alexa at the scene.

Appellant testified at the trial. He was vigorously cross-examined by the attorney for the Commonwealth. The prosecution attempted to show that some of the statements made by the defendant to investigating police officer Alexa were inconsistent with his direct testimony at trial.

The matter of cross-examination and the procedure employed for impeaching a witness by confronting him with prior inconsistent statements is a matter within the sound discretion of the trial judge, subject to reversal only if the discretion is abused. *Commonwealth v. Dennison,* 441 Pa. 334, 272 A.2d 180 (1971); See also, 2 Henry Pa. Evidence § 803 (4th ed. 1953), and 3 Wigmore, Evidence, § 1028 (3rd ed. 1940). On review of the record we fail to find that the trial judge abused his discretion in this regard.

■ Appellant also contends that it was error to permit the District Attorney to offer the rebuttal testimony of Officer Alexa concerning these prior inconsistent statements. We disagree.

In direct testimony, Thomas related that Smith returned with his hat over his hand and that he thought he may have had a gun. Appellant was asked on cross-examination whether he had told Officer Alexa that when Smith returned he had a gun with him. Appellant testified on cross-examination that he never told Alexa that Smith returned with a gun, rather that he had told Alexa that Smith returned with his hat over his hand. The obvious purpose of offering Alexa as a rebuttal witness was to impeach the credibility of the defendant because Alexa testified that the appellant told him that ". . . the guy came back with a gun and I shot him." [12] Thus the testimony of Officer Alexa was properly admitted as rebuttal testimony concerning the prior inconsistent statements of appellant. [13]

■ Finally, the defendant claims that the verdict was contrary to the evidence and to the weight of the evidence. Specifically, appellant, without articulating any reason or reference to the record, contends that the testimony viewed in its entirety makes it clear that the defendant acted reasonably in his own defense and in the defense of his sister. In making this claim, appellant fails to specifically identify any error made by the trial judge. While the absence of an identifiable error is troublesome to us, our review of the record fails to support this contention. As stated in *Commonwealth v. Rose*, 463 Pa. 264, 344 A.2d 824 (1975):

12. N.T. Trial, p. 200.

13. If a witness does not remember his alleged prior inconsistent statement, we agree with appellant that the introduction of the statement is improper impeachment. But the rule has no application to this case. True, appellant testified on cross-examination that he did not remember making many of the statements supposedly made to Alexa. But the only question put to Alexa in rebuttal concerned a statement appellant said he did not make. Therefore, it was proper.

"The test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing the proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime had been established beyond a reasonable doubt. Moreover, it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. The factfinder is free to believe all, part or none of the evidence."

Applying this test to the evidence in this case we are satisfied that the Commonwealth has met its burden of establishing guilt beyond a reasonable doubt. Failing to find error, we will dismiss the appeal and affirm the judgment of sentence of the lower court.

PRICE, J., files a dissenting opinion.

PRICE, Judge, dissenting:

This appeal involves the appellant's contention that the suppression court erred in admitting a statement made by appellant following a warning pursuant to Section 10–110 of the Philadelphia Home Rule Charter. I agree and respectfully dissent. On the basis of the improper admission of appellant's statement I would vacate the judgment of sentence and remand for a new trial.

Although the majority essentially recaps the facts, I repeat them here, with some enlargement in pertinent regards. At or about 6:30 p. m. on July 5, 1977, appellant's sister, Marva Crafton, was assaulted in the vicinity of her residence by Joseph Smith.[1] Following the assault Miss Crafton phoned appellant, an off-duty policeman, and informed him of the attack. Appellant went directly to his sister's house where he found her bruised and disquieted.

Mr. Smith returned at approximately 7:45 p. m. while appellant was still at his sister's house. As Miss Crafton

---

1. Mr. Smith pleaded guilty to charges of aggravated assault, simple assault and recklessly endangering the life of another and received a one year's probationary sentence.

watched Mr. Smith approach the house, she told appellant that he was armed. Appellant hid behind the door holding his baton and gun as Mr. Smith, who in fact was unarmed, entered the house. Mr. Smith was shot and struck with the baton during the ensuing struggle. Mr. Smith fled the scene and drove himself to a hospital for emergency care.

Soon thereafter, appellant notified the police department of the incident. Captain Murray, the investigating officer, arrived at the scene at approximately 10:00 p. m. From his preliminary investigation he learned that Miss Crafton had been attacked by an individual who was subsequently shot by appellant. Shortly after 11:00 p. m., Captain Murray ordered Officer Thomas to go to the Police Administration Building to give a statement. (N.T. Suppression Hearing 13–14, 30). At this time Officer Thomas was not suspected of any criminal activity, however his statement was considered necessary to the investigation because of his known involvement in the incident. (N.T. Suppression Hearing 14–17, 27–8). Captain Murray, therefore, denied repeated requests by Officer Thomas to postpone giving a statement, and told him that as a police officer, he was required to comply with the order under Section 10–110 of the Philadelphia Home Rule Charter. (N.T. Suppression Hearing 14–17, 27–8).[2] Under this provision, had Officer Thomas failed to

2. The following testimony is illustrative of these facts.

> Q. [MR. FRANZEL]: Would you tell the Court what happened with respect to Officer Thomas coming down to the Police Administration Building?
> A. [CAPTAIN MURRAY]: I told Thomas to come down to the Police Administration Building, and he asked me could he come down tomorrow . . . and I said no, he could not.
> Q. [MR. FRANZEL]: Why did you tell him he couldn't come down the next day?
> A. Because we were in the middle of an investigation, and we had to have answers. A policeman's revolver was involved, and we had to, you know, find out what happened and why.
> Q. What else transpired between yourself and Officer Thomas at that time?
> A. Nothing. Officer Thomas again asked could he come down at a later date, and I told him no, he would have to come down and give his statement as to his part in this incident.

(N.T. Suppression Hearing 14–16).

comply with the order, he would have lost his job and been ineligible for future city service employment.[3]

Subsequent to giving the Section 10–110 order, Captain Murray received information indicating that appellant might have been criminally involved in the incident. At the station Captain Murray advised Officer Thomas' attorney, Mr. Bernstein, of the possible criminal implications and further informed the attorney that he would like to take a statement from Officer Thomas. Officer Thomas conferred with Mr. Bernstein, who raised no objection to Captain Murray taking a statement. (N.T. Suppression Hearing 20–1). At approximately 1:45 a. m. Captain Murray advised appellant

> Q. Captain Murray, prior to taking the statement from Officer Murray—I mean Officer Thomas, did you at any time refer to the City Charter Provision 10–110?
> A. One time, yes, I did.
> Q. And where did you refer to that City Charter, sir?
> A. At Miss Crafton's residence prior to Officer Thomas leaving.
> Q. Would you tell the Court what your reference to that City Charter Provision was, and how it came up?
> A. We told Officer Thomas to come down to get his things together, and come down to Homicide, and he requested could he come down at a later time. And I told him no. He said, "Well, I would like to come down tomorrow."
> I said, "Don't you understand that you have to give a statement? You are involved in some activity here, and I have to investigate this under the City Charter, under 10—"
> Q. [THE COURT]: 10 What?
> A. [CAPTAIN MURRAY]: 10–110 Section, Your Honor. I said I have to get this done this evening.
> (N.T. Suppression Hearing 27–8).

3. Section 10–110 of the Philadelphia Home Rule Charter reads as follows:

> If any officer or employee of the City shall willfully refuse or fail to appear before any court, or before the Council or any committee thereof, or before any officer, department, board, commission or body authorized to conduct any hearing or inquiry, or having appeared, shall refuse to testify or to answer any question relating to the affairs or government of the City or the conduct of any City officer or employe on the ground that his testimony or answers would tend to incriminate him or shall refuse to waive immunity from prosecution on account of any matter about which he may be asked to testify before such court or at any such hearing or inquiry, he shall *forfeit his office or position, and shall not be eligible thereafter for appointment to any position in the City service.*
> (emphasis added).

of his *Miranda* rights and, following an oral waiver of such rights, took his statement. (N.T. Suppression Hearing 24A). At no time, however, did Captain Murray withdraw his Section 10–110 order compelling Officer Thomas to give a statement. (N.T. Suppression Hearing 35–7). Appellant was permitted to leave the station and was arrested later that day.

It is our responsibility to determine if the record supports the factual findings of the trial court and to evaluate "the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Thorpe*, 270 Pa.Super. 221, 227, 411 A.2d 497, 500 (1979), *quoting Commonwealth v. Goodwin*, 460 Pa. 516, 521, 333 A.2d 892, 895 (1975). *See also Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980). Therefore, in determining the propriety of the trial court's admission of appellant's statement we can " 'consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' " *Commonwealth v. Brown*, 473 Pa. 562, 566, 375 A.2d 1260, 1262 (1977), *quoting Commonwealth v. Kichline*, 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976). *Commonwealth v. Williams*, 484 Pa. 590, 400 A.2d 1258 (1979); *Commonwealth v. Starks*, 484 Pa. 399, 399 A.2d 353 (1979). Reading the record in this fashion, I cannot agree with the trial court's conclusion that appellant's waiver was voluntary.

It is axiomatic that a "[w]aiver of the constitutional privilege against self-incrimination . . . must be a voluntary, knowing and intelligent decision." *Commonwealth v. Thomas*, 258 Pa.Super. 332, 335, 392 A.2d 820, 821 (1978). *See also Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980); *Commonwealth v. Simmons*, 482 Pa. 496, 394 A.2d 431 (1978). The Commonwealth bears the burden of proving a valid waiver by a preponderance of the evidence, *Commonwealth v. Kingsley*, 480 Pa. 560, 391 A.2d 1027 (1978); *Commonwealth v. Bullard*, 465 Pa. 341, 350 A.2d 797 (1976); *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972),

and an effective waiver is a prerequisite to the admissibility of all statements, whether inculpatory or exculpatory. *Commonwealth v. Smith*, 465 Pa. 310, 350 A.2d 410 (1976); *Commonwealth v. Bordner*, 432 Pa. 405, 247 A.2d 612 (1968). Therefore, appellant's statements are admissible only if his decision to waive his right to remain silent was the product of an independent and knowledgable choice. *Commonwealth v. Kichline*, 468 Pa. at 265, 361 A.2d at 282.

I find it apparent that Officer Thomas was not subjected to physical coercion. He reported to the station without police escort, and while at the station his freedom of movement was not restricted. He appeared calm and coherent when giving his statement and was subsequently permitted to leave the station. (N.T. Suppression Hearing 23, 25). Further, appellant was afforded his right to counsel. Appellant phoned Mr. Bernstein from the police department and had the opportunity to speak with him prior to making a statement. (N.T. Suppression Hearing 19–22, 31–32).

The psychological state of a defendant is also a factor in determining whether a waiver was voluntarily obtained. *Commonwealth v. Bodge*, 256 Pa.Super. 376, 389 A.2d 1172 (1978). Our supreme court "has emphasized that when 'the questions in the voluntariness area have passed beyond the physical coercion stage to the much more difficult area of psychological coercion . . . a close analysis of all the surrounding circumstances is necessary.' " *Commonwealth v. Eiland*, 450 Pa. 566, 574, 301 A.2d 651, 654 (1973), *quoting Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 149, 239 A.2d 426, 430 (1968). Therefore, in the instant case one must scrutinize all attending circumstances surrounding appellant's waiver to determine whether it was the product of independent thought or psychological coercion.

It is the difficult area of psychological coercion that poses the problem in this appeal. The Section 10–110 order, under the facts now before us, places this case, in my opinion, somewhere between *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975) relied upon by the appellant, and *Commonwealth v. Kelly*, 245 Pa.Super. 351, 369 A.2d 438 (1976)

relied upon by the Commonwealth. In *Triplett* several Philadelphia police officers reported witnessing another officer, the appellant, larcenously remove several television sets. The appellant was later called before his supervisors for questioning. Prior to any interrogation he was given the following warning: "I wish to inform you that this is an official investigation, and under the provisions of the Philadelphia Home Rule Charter, Section 10–110, you are required to cooperate fully and answer all questions." 462 Pa. at 246–47, 341 A.2d at 63. During this interrogation, appellant admitted his participation in the incident. Appellant was subsequently given *Miranda* warnings and again made certain admissions. Adopting the rationale enunciated in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the court held that statements compelled by Section 10–110 are inadmissible at a state criminal trial. 462 Pa. at 248, 341 A.2d at 64. The statements preceded by the *Miranda* warnings were held inadmissible since they were a product of the earlier constitutionally infirm statements.

In *Kelly* this court applied the *Triplett* rationale to the following circumstances. In a grand jury proceeding all of the witnesses were advised of their right against self-incrimination, and were told that if a Philadelphia employee chose to claim the privilege additional instructions would be given. Appellant, a police officer, claimed the privilege in response to two questions, but the Section 10–110 warning was never given. Appellant's testimony was admitted as evidence in his subsequent perjury trial. In reaching our decision we emphasized that "[i]t is clear that statements made under threat of being discharged are the products of coercion and are therefore inadmissible at trial." 245 Pa.Super. at 361, 369 A.2d at 443. However, we upheld the lower court's opinion since the Section 10–110 warnings had not been given and appellant did exercise his right against self-incrimination. The case at bar is clearly distinguishable in that appellant was given the Section 10–110 warnings and did in fact waive his fifth amendment privilege.

The Commonwealth Court has also considered the impact of the Section 10–110 warning, and although the cases involve discharges from employment, these holdings are helpful in the present determination. In its most recent case the court held that a city fireman could not be fired for leaving a department inquiry in violation of Section 10–110. *Strauss v. Civil Service Commission of Philadelphia,* 40 Pa. Cmwlth. 560, 398 A.2d 1064 (1979).[4] This holding was based on our supreme court's determination that Section 10–110 of the Home Rule Charter is constitutionally defective to the extent it coerces a waiver of the privilege against self-incrimination.

In *DiCiacco v. Civil Service Commission of Philadelphia,* 37 Pa.Cmwlth. 77, 389 A.2d 703 (1978), the Commonwealth Court noted the intrinsic contradiction between the *Miranda* and Charter Warnings. "[T]he employee is told that he has a right under *Miranda* to remain silent, to say nothing at all, but then is told that if he exercises this right, he will be discharged under Section 10–110." 37 Pa.Cmwlth. at 87 n.6, 389 A.2d at 709 n.6.[5] I agree that this conflict exists. An individual's rights under *Miranda* must be jealously guarded. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If the Charter warning coerces a waiver of *Miranda* rights the policy behind *Miranda* is circumvented unless all statements made as a result of this waiver are suppressed.

**4.** This is indicative of the Commonwealth Court's expansion of the doctrine enunciated in *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975), to encompass statements offered in non-criminal proceedings. *See also Leroi v. Civil Service Comm'n of Philadelphia,* 34 Pa.Cmwlth. 190, 382 A.2d 1260 (1978); *DiCiacco v. Civil Service Comm'n of Philadelphia,* 37 Pa.Cmwlth. 77, 389 A.2d 703 (1978). Both cases applied *Triplett* to statements admitted into evidence at discharge hearings.

**5.** In *Leroi* and *DiCiacco* the Court declined to decide whether it would be more disposed to hold testimony admissible if Miranda warnings had been given in addition to Charter warnings. In both cases exculpatory statements were admitted on the basis that they were not incriminating. Such reasoning is clearly inapplicable in a criminal proceeding since statements made subsequent to a coerced *Miranda* waiver are inadmissible regardless of their nature. *Commonwealth v. Bordner,* 432 Pa. 405, 247 A.2d 612 (1968).

The landmark United States Supreme Court case addressing waivers coerced by economic sanctions is *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In *Garrity*, appellants were each warned prior to interrogation: "(1) that anything [they] said might be used against [them] in any state criminal proceeding: (2) that [they] had the privilege to refuse to answer if the disclosure would tend to incriminate [them]; but (3) that if [they] refused to answer [they] would be subject to removal from office." 385 U.S. at 494, 87 S.Ct. at 617 (footnote omitted). No immunity was granted and some of the statements were used in subsequent prosecutions. The Court held that the fourteenth amendment extends to the individual the fifth amendment right to be protected against coerced statements, and therefore prohibits the use "in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." 385 U.S. at 500, 87 S.Ct. 620.[6] The doctrine promulgated in *Garrity* and adopt-

---

**6.** The Court has zealously upheld the privilege against self-incrimination from infringement by economic duress. In *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), a provision of a New York City statute requiring policemen to waive immunity or forfeit their job was held violative of the fourteenth and fifth amendments. The Court censured such statutes stating that "the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment." 392 U.S. at 279, 88 S.Ct. at 1916. In a case decided the same day as *Gardner* the Court reiterated that public employees are entitled to the privilege against self-incrimination and that a statute threatening unemployment unless this privilege is waived is unconstitutional. *Uniformed Sanitation Men Ass'n v. Comm'n of Sanitation of the City of New York*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). In *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), a unanimous Court held a New York statute that sought to compel testimony from public contractors by threatening cancellation of all current contracts and disqualification from future contracts to be unconstitutional under the fourteenth and fifth amendments. In reaching this holding the court stressed that "[i]mmunity is required if there is to be 'rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify.'" 414 U.S. at 81, 94 S.Ct. at 324, *quoting Kastigar v. United States*, 406 U.S. 441, 446, 92 S.Ct. 1653, 1657, 32 L.Ed.2d 212 (1972).

ed by our supreme court in *Triplett* sets forth a strong denunciation of such methods of interrogation [7] and, therefore, whenever this coercive scheme is present we must closely review the circumstances to assure that the privilege has not been abridged.

I conclude that appellant's waiver was tainted by the prior Charter warning. If appellant's statement had not been preceded by a waiver of his *Miranda* rights it would clearly have been suppressed as compelled by the Section 10–110 order, since his presence at the station and his subsequent statement were in response to the order. The policy behind the Charter warning, to use economic pressure to coerce a statement, is repugnant to that of the *Miranda* warnings. Where the Charter warning serves to psychologically coerce a waiver of *Miranda* rights the waiver clearly cannot be deemed voluntary. I would find that the period of two and a half to three hours between the Charter and *Miranda* warnings is not sufficient to purge the waiver of its taint where, as in the instant case, the Charter warning was never withdrawn, the *Miranda* warnings were given by the same officer who gave the Charter warning, and the appellant was under order given under Section 10–110 to be at the police station and to give a statement. On these grounds I would reverse the judgment of sentence and remand to the trial court for a new trial.

7. In a broad condemnation of this procedure the Court stated: "We think the statements were infected by the *coercion inherent in this scheme of questioning* and cannot be sustained as voluntary under our prior decisions." *Garrity v. New Jersey*, 385 U.S. 493, 497–98, 87 S.Ct. 616, 618–19, 17 L.Ed.2d 562 (1967) (emphasis added). In *Lefkowitz* the Court again held that "[a] waiver secured under threat of substantial economic sanction cannot be termed voluntary." 414 U.S. at 82–3.