Commonwealth *v.* D'Nicuola, Appellant.

Argued January 11, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Edwin P. Rome,* with him *Jerome R. Richter,* and *Blank, Rome, Klaus & Comisky,* for appellant.

*Charles H. Spaziani,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE NIX, June 28, 1972:

Appellant, Thomas D'Nicuola, was arrested on October 22, 1969, and charged with the murder of Thomas Effting. D'Nicuola had been discovered in his automobile on October 20, 1969, by the Easton police in a comatose condition due to an overdose of the drug Doriden, a tranquilizer. At the time he was found in the vehicle, the police also discovered and seized a revolver that had recently been fired three times. It was later determined that this weapon had fired the bullets found in Effting's body.

On October 21, 1969, while a patient in Easton Hospital, D'Nicuola was questioned extensively by the police for 20 to 30 minutes. Allegedly, the interview was conducted as a routine follow-up to the apparent suicide

attempt by D'Nicuola. However, even though the police were unaware of Thomas Effting's death at the time of the interview, they knew that Effting and D'Nicuola had not kept a previously scheduled appointment with an attorney the preceding day and that Effting was missing. In addition, the revolver found when D'Nicuola was removed from his car was shown to him during the interview and he was asked if it was his, and if so, where he had obtained it. It was at this point, upon further questioning, that certain incriminating statements concerning Effting were made by appellant causing the officers to leave the room after having "enter into mind what possibly did happen." Record, Vol. 1, at 235a.

At a pre-trial suppression hearing appellant attacked the admissibility of the incriminating statements he made to the police while hospitalized but the trial judge denied the motion. The jury convicted D'Nicuola of first degree murder, and fixed the penalty at life imprisonment. Motions in arrest of judgment and for a new trial were dismissed in an opinion by the Common Pleas Court of Northampton County. This appeal followed.

The crucial issue before us in deciding whether the oral statements made by D'Nicuola are admissible is whether it was necessary under the circumstances of this case to warn him of his right to remain silent and his right to have a lawyer as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). The Commonwealth maintains that it was not necessary to issue the *Miranda* warnings since the police were neither holding appellant in custody so as to restrain his freedom in any significant way nor were they questioning him concerning any particular crime.

When previously confronted with this issue of whether a "custodial interrogation" had taken place,

we conclusively established that "whenever an individual is questioned while in custody *or* while the object of an investigation of which he is the focus, before *any* questioning begins the individual must be given the warnings established in Miranda. See Commonwealth v. Jefferson, 423 Pa. 541, 226 A. 2d 765 (1967); Commonwealth v. Barclay, 212 Pa. Superior Ct. 25, 240 A. 2d 838 (1968) (HOFFMAN, J., dissenting); Windsor v. United States, 389 F. 2d 530, 534 (5th Cir. 1968); Graham, What is Custodial Interrogation?: California's Anticipatory Application of Miranda v. Arizona, 14 U.C.L.A. L. Rev. 59, 114-117 (1966); cf. Allen v. United States, 390 F. 2d 476 (D.C. Cir. 1968)." *Commonwealth v. Feldman,* 432 Pa. 428, 432-33, 248 A. 2d 1, 3 (1968). It has also been determined that "[c]ustodial interrogation is not limited to police station questioning or that occurring after a formal arrest." *Commonwealth v. Jefferson, supra,* at 546, 226 A. 2d at 768.

Applying this rationale to the instant case, it is apparent that while hospitalized D'Nicuola had become the focus of an investigation and should have been given the *Miranda* warnings. Although at the time of the hospital interview the police were unaware of Thomas Effting's death, they definitely knew that Effting was missing and that he and D'Nicuola had not kept a previously scheduled appointment. Being aware of these circumstances and having found a recently fired revolver in D'Nicuola's automobile, it is naive to assume that when the police came to the hospital to question the appellant they were merely following up on an attempted suicide. This point is further substantiated by the fact that the first specific questions asked by the police concerned the ownership of the weapon. If the police were merely investigating the attempted suicide, it would not have been necessary to produce the revolver which clearly was not involved in the attempt

and question appellant concerning its ownership. It was this type of forced questioning the Supreme Court was concerned with in *Miranda* when it interpreted custodial interrogation to "mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise *deprived of his freedom of action in any significant way.*" 384 U.S. at 444 (footnote omitted) (emphasis added). Clearly, while appellant was confined to his hospital room his "freedom of action" was restricted and this "custody" coupled with the accusatory nature of the interview, mandates our conclusion that appellant's Constitutional rights were violated when he was not given the *Miranda* warnings before the "custodial interrogation" began.

The Commonwealth's alternative argument that the *Miranda* warnings were not necessary since appellant was not under investigation for any particular crime overlooks the fact that in *Mathis v. United States,* 391 U.S. 1 (1968), the Supreme Court completely rejected the argument that *Miranda* is only applicable to interrogation concerning the specific offense for which the individual is "in custody". It was held that "[t]here is no substance to such a distinction, and in effect it goes against the whole purpose of the Miranda decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the Miranda opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody. In speaking of 'custody' the language of the Miranda opinion is clear and unequivocal. 'To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.' 384 U.S. at 478." 391 U.S. at 4-5. As a

result of this interpretation of *Miranda,* this Court subsequently established the law in Pennsylvania to be "that when an individual is placed in custody for any reason, he cannot be interrogated without first being advised of his rights regardless of whether the investigation has focused on him as a suspect in a particular crime." *Commonwealth v. Simala,* 434 Pa. 219, 224-25, 252 A. 2d 575, 578 (1969).

Here the police had definitely begun to focus on the appellant's criminal behavior. This is evidenced by the fact that they came to the hospital uninvited, initiated the general discussion, specifically inquired about the revolver and followed up on D'Nicuola's statements about Effting with questions designed to elicit further information. It is highly probable that the police were not only focusing on him with respect to Effting's disappearance, but also investigating other crimes in which appellant would have been a principal suspect. For example, even though attempted suicide itself is not a crime, the police could have been investigating a possible unauthorized use and possession of a dangerous drug.[1] Or, it is equally possible that the appellant was under investigation for a violation of the Uniform Firearms Act.[2] In both situations, as well as in Effting's disappearance, a suspicion of criminality was attached to D'Nicuola's behavior. Clearly, *Miranda* warnings

---

[1] The term "dangerous drug" is defined generally as barbiturates, amphetamines, and other habit-forming drugs. The Drug, Device and Cosmetic Act, Act of September 26, 1961, P. L. 1664, §2, 35 P.S. §780-2(h). Under Section 20(a) of The Drug, Device and Cosmetic Act, *supra,* 35 P.S. §780-20(a), the use or possession of a dangerous drug (as opposed to a narcotic drug) is a misdemeanor.

[2] The Uniform Firearms Act, Act of June 24, 1939, P. L. 872, §628, 18 P.S. §4628(e), *as amended* (Supp. 1972-1973), provides for the mandatory licensing of all firearms carried in an automobile. The violation of this provision is a misdemeanor. Uniform Firearms Act, *supra,* 18 P.S. §4628(p).

are necessary before the police may conduct a 20 to 30 minute interrogation in the hope of evoking admissions concerning apparent criminal behavior.

In light of our conclusion that appellant's incriminating statements to the police were admitted into evidence in violation of his Constitutional rights, we need not pass upon appellant's other contentions.

The judgment of sentence by the Court of Common Pleas of Northampton County is reversed and a new trial granted.

Mr. Chief Justice JONES and Mr. Justice EAGEN concur in the result.