442 A.2d 682

**COMMONWEALTH of Pennsylvania,**

v.

**James HORNER, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 21, 1982.

Decided March 17, 1982.

566

William T. Cannon (Court-appointed), Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty., Michele Goldfarb Lehr, Steven Cooperstein, Asst. Dist. Attys., for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

568

## OPINION

LARSEN, Justice.

On November 22, 1978, a jury convicted appellant James Horner of murder of the third degree, criminal conspiracy and simple assault for his participation in the shooting death of Robert Mendel and the assault on his wife, Nancy Mendel. Appellant was subsequently sentenced to concurrent terms of imprisonment of 8½ to 17 years for the murder, 3 to 6 years for the conspiracy, and 1 to 2 years for the assault. Post-verdict motions were denied and this direct appeal followed.[1]

I. Appellant first contends that the evidence is insufficient to support his conviction for murder of the third degree. Since it was undisputed that appellant did not fire any of the shots which hit Robert Mendel, the Commonwealth proceeded to establish appellant's guilt based upon a theory of conspiracy. Appellant argues, however, that the evidence was insufficient to establish the existence of such a conspiracy.

> The test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing the proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime had been established beyond a reasonable doubt.

*Commonwealth v. Pitts*, 486 Pa. 212, 215, 404 A.2d 1305, 1306 (1979) (citations omitted). The record, viewed in the light most favorable to the Commonwealth, reveals the following facts:

Robert and Nancy Mendel and their children lived next door to James and Geraldine Stetler, their children, and several children from Geraldine's prior marriage to appellant; appellant was a frequent visitor to the Stetler home. The Mendels and the Stetlers lived in adjoining homes which shared a party wall and a landing outside their front doors,

---

1. The Superior Court certified the appeal from the judgments of sentence for simple assault and criminal conspiracy to this Court.

and there was a history of discord between the two households.

At trial, appellant's friend, Mrs. Karol Ann Schwarz, repeated a conversation which took place while she and appellant were returning to Philadelphia from a New Jersey motel on May 2, 1977. At that time, appellant told Mrs. Schwarz that he was in a hurry to get home because he had to pick up a friend, Edwin Meredith, and that he and Meredith were going to Geraldine's house "to plan how to take care of the Mendels once and for all." According to Mrs. Schwarz, appellant stated that "Mr. Meredith had experience in things like this, that when you wanted someone knocked off, he was the one to get. And even the fact maybe that it would cost him [appellant], it was worth it to get rid of him [Mendel], of the problems." Mrs. Schwarz further testified that one week after the shooting, appellant admitted to her that on the evening of May 7, 1977, he and Edwin Meredith had gone next door to the Mendel home "because they wanted to start an argument, a fight, and . . . they knocked at the door, but Mr. Mendel didn't come to the door, Mrs. Mendel did."

Further testimony at trial revealed that on the night of the shooting, appellant and Edwin Meredith went to the Mendel home and banged on the door. When Nancy Mendel came to the door, appellant shouted into the house, "You fat m——f——, you're going to get it now." The men then opened the door, pulled Nancy Mendel out of her house and began beating her. In response to his wife's screams, Robert Mendel came out of the house and succeeded in getting his wife and himself back inside.[2] As the Mendels reentered their home, Edwin Meredith shouted after them, "Now we're going to get you." After Nancy Mendel had spoken by telephone with the police, she and her husband went out onto the landing in front of their house to wait for the police to arrive. While they were waiting, Edwin Meredith opened

2. As a result of this incident, Nancy Mendel sustained a dislocated jaw, a black eye, a five-inch cut on her neck and numerous bruises; Robert Mendel sustained a cut on his face.

the door of the Stetler home and pulled Robert Mendel into the house, where James Stetler and David Horner (appellant's fifteen-year-old son) were waiting to shoot him with a .22 caliber rifle and a high-powered .308 caliber rifle.

All theories that are recognized under our law to hold one responsible for the criminal acts of another require the existence of a shared criminal intent. It is well settled that the nexus which renders all members of a criminal conspiracy responsible for the acts of any of its members is the unlawful agreement.

*Commonwealth v. Wilson,* 449 Pa. 235, 238, 296 A.2d 719, 721 (1972).

■ In this case, in view of appellant's role in procuring the assistance of Edwin Meredith to "get rid of" Robert Mendel, and his participation in starting a fight with the Mendels immediately before the shooting, there was sufficient evidence to establish the fact that appellant was part of a conspiracy to "knock off" Robert Mendel.[3]

II. Appellant next argues that his conviction for murder of the third degree must be reversed and that he must be discharged because the Commonwealth failed to bring him to trial within 180 days, in violation of Rule 1100, Pa.R. Crim.P.[4]

On May 8, 1977, a complaint was filed against appellant charging him with murder and related offenses stemming from the shooting death of Robert Mendel on May 7, 1977. After a preliminary hearing on May 25, 1977, appellant was

3. Appellant also argues that there were inconsistencies in the testimony of Mrs. Schwarz which rendered the evidence in this case insufficient. However, the fact that there may have been inconsistencies in the evidence does not alter our conclusion that the evidence was sufficient, since the weight and credibility of admissible evidence are solely within the province of the jury. *See Commonwealth v. Harper,* 485 Pa. 572, 576–77, 403 A.2d 536, 539 (1979).

4. Rule 1100(a)(2) provides:
Trial in a court case in which a written complaint is filed against the defendant after June 30, 1974 shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed.

discharged and the complaint was dismissed because the Commonwealth had failed to establish a prima facie case.[5]

On January 7, 1978, while he was free on bail, appellant appeared at the home of his friend, Mrs. Karol Ann Schwarz, banging on the door and using obscene language, thus prompting her to call the police. As a result of this incident, Mrs. Schwarz came forward and provided the Commonwealth with the evidence it needed to rearrest appellant and try him for murder. On February 27, 1978, a second complaint was filed against appellant charging him with the murder of Robert Mendel.

Appellant claims that with respect to the complaint of February 27, 1978, the 180 days of Rule 1100 began to run on May 8, 1977, the date of the first complaint, which had been dismissed on May 25, 1977.[6] Appellant argues that since the Commonwealth's application for an extension of time under Rule 1100 (with respect to the assault and conspiracy charges—at this time there *was* no charge of murder outstanding) was not filed until November 18, 1977, fourteen days after the 180-day period commencing on May 8, 1977 would have run,[7] his conviction for murder must be reversed and he must be discharged with respect to that crime.[8]

5. On May 19, 1977, a complaint was filed against appellant and he was charged with aggravated assault, simple assault and criminal conspiracy arising out of the attack upon Nancy Mendel, also on May 7, 1977. After the preliminary hearing on May 25, 1977, appellant was held for trial on these charges. On November 18, 1977, the Commonwealth filed an application for an extension of time with respect to these charges under Rule 1100.

6. One hundred eighty days from May 8, 1977 was November 4, 1977.

7. Rule 1100(c) provides in pertinent part: "At any time prior to the expiration of the period for commencement of trial, the attorney for the Commonwealth may apply to the court for an order extending the time for commencement of trial."

8. Appellant does not claim that there was any violation of Rule 1100 with respect to his trial on the assault and conspiracy charges contained in the complaint of May 19, 1977.

■   This argument is without merit. This Court has held that when a criminal complaint has been dismissed because the Commonwealth has failed to establish a prima facie case, it becomes "a nullity for *all* purposes, including Rule 1100." *Commonwealth v. Genovese*, 493 Pa. 65, 71, 425 A.2d 367, 370 (1981) (emphasis in original).   Since the first complaint against appellant ceased to have any legal effect once it had been dismissed, Rule 1100 could not have begun to run from the date of that complaint.

In fact, Rule 1100 began to run in this case on February 27, 1978, the date on which the only effective complaint charging appellant with murder was filed.   As this Court has recognized, "[n]either the language nor the spirit of Rule 1100 is inconsistent with the logical, common sense conclusion that the 180 days must run from the filing of the second complaint, the one which commenced this prosecution." *Id.*, 493 Pa. at 72–73, 425 A.2d at 371.[9]

The common sense and logic of this conclusion are clear. In this case, there was no time between appellant's preliminary hearing on May 25, 1977 and the alleged run date of November 4, 1977 during which the Commonwealth could have tried appellant for murder, because at no time during that period was appellant subject to any charge of murder. Likewise, during this period there was no reason for the Commonwealth to apply for an extension of time under Rule 1100 with respect to a charge of murder, because there were no murder charges pending against appellant and because the Commonwealth had no reason to believe that a trial for murder would be taking place in the future.

This Court will not discharge appellant because the Commonwealth failed to try him within 180 days for a crime

**9.**  Appellant seeks to rely on this Court's opinion in *Commonwealth v. Earp*, 476 Pa. 369, 382 A.2d 1215 (1978) to support his contention that Rule 1100 began to run on May 8, 1977, the date of the first complaint filed against him.   *Earp* was a plurality opinion joined by only two members of this Court.   We note that *Earp* is factually inapposite to the present case, in that *Earp* dealt with the dismissal of fewer than all the charges contained in a single complaint, whereas this case deals with the dismissal of an entire complaint and the filing of a new complaint at a later date.

with which he was not charged during those 180 days. As this Court has stated, "[t]he administrative mandate of Rule 1100 certainly was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth." *Id.*, 493 Pa. at 70, 425 A.2d at 370.

■ III. Appellant next argues that the trial court erred in allowing the Commonwealth to read into evidence the statement he made to the police on May 8, 1977 after the shooting. Appellant contends that his statement was the product of custodial interrogation and that since it was not preceded by *Miranda* warnings, it should have been suppressed.[10]

In reviewing the action of the trial court, our initial task is to determine whether the factual findings are supported by the record. "In making this determination, we are to consider only the evidence of the prosecution's witnesses and so much evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted." . . . If, when so viewed, the evidence supports the factual findings we are bound by such findings; we may only reverse if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Johnson*, 467 Pa. 146, 151–52, 354 A.2d 886, 889 (1976) (citation omitted; footnote omitted).

Viewed in this light, the suppression record reveals that police arrived at the Stetler house at 10:55 p.m. on the night of the shooting. After Geraldine Stetler had been arrested and removed from the house,[11] the police told appellant, David Horner, James Stetler and Edwin Meredith that "[t]hey were being taken to Homicide as witnesses," and

10. "Although *Miranda* warnings are not required before interviewing all possible witnesses to the crime, they are required 'whenever an individual is questioned while in custody *or* while the object of an investigation of which he is the focus.'" *Commonwealth v. O'Shea*, 456 Pa. 288, 291, 318 A.2d 713, 714 (1974) (emphasis in original; citation omitted).

11. Geraldine Stetler was arrested in the house and taken into custody after she told the police that she had shot Robert Mendel.

that "they were going. As witnesses." At 11:25, police officers transported the men in a single police van to the Police Administration Building. Unlike defendants, none of the men was frisked or handcuffed, nor were the men transported separately to the police station.

At the suppression hearing, there was testimony that it was customary to take homicide witnesses to the police station in a police van even if they did not want to go. Thus, although one officer testified that none of the men were free to leave the house, they were nevertheless not in custody. The officers testified that it was not appropriate to ask witnesses to come to police headquarters on their own, and that the police vans in which they transported witnesses were locked for safety purposes. Although the officers testified that witnesses were free to leave the van, the officers added that they would have to let their supervisor actually allow someone to leave.

When the men arrived at police headquarters, they entered the Homicide Unit through the visitor's door, signed in as witnesses and were allowed to sit together in the witness waiting area. At the hearing, officers testified that the Homicide Unit is a secured area and that individuals must be "buzzed" in and escorted out. Again, although there was testimony that appellant would have been free to leave at this time, an officer would have had to let his supervisor actually permit him to leave.

Appellant's interview began at 12:35 a.m. at a desk in an open area of the Homicide Unit. Appellant was told by Detective Hughes that he was going to be interviewed, and Detective Hughes testified that he did not give appellant any *Miranda* warnings because "he was a witness at that time." Detective Hughes testified that there were no interruptions during the interview and that he did not receive any updated information on the shooting while the interview was in progress. Appellant's interview was completed at 1:50 a.m.

The testimony of the Commonwealth's witnesses at the suppression hearing was uniformly to the effect that appel-

lant was cooperative at all times before and during the interview, and that until some time between 3:30 and 4:00 a.m. when the statements of all the witnesses were reviewed and when the decision was made to arrest appellant, the police considered him to be in the "witness category." In fact, appellant himself testified at the suppression hearing that it was not until the conclusion of his interview, when he claims that Detective Hughes called him a liar, that he thought he would be involved in this case as anything other than a witness.

> [T]he test for custodial interrogation "does not depend upon the subjective intent of the law enforcement officer-interrogator, but upon whether the suspect is physically deprived of his freedom of action in any significant way or is *placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation* . . .".

*Commonwealth v. O'Shea*, 456 Pa. 288, 292, 318 A.2d 713, 715 (1974) (emphasis in original; citation omitted).

In light of these facts, the trial court was correct in concluding that appellant was neither in custody nor the focus of any investigation at the time he gave Detective Hughes his statement; that appellant was not under custodial interrogation at the time he made his statement; that *Miranda* warnings were not necessary; and that appellant's statement was admissible in evidence at trial.[12]

---

12. This Court affirmed the same conclusions in the factually similar case of *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980), a majority opinion with which this writer concurred in the result. In *Patterson*, Philadelphia police found the appellant and three of his friends at the home of one friend. The police transported all four to police headquarters to be interviewed concerning a recent homicide. Although the police testified at the appellant's suppression hearing that the appellant could have left at any time, he remained in a locked waiting room while he was at the Police Administration Building. This Court concluded that the appellant had gone voluntarily to police headquarters to provide information concerning the victims; that the appellant's interview did not constitute custodial interrogation; that *Miranda* warnings were, therefore, unnecessary; and that the appellant's statement had been properly admitted against him at trial.

■ IV. Finally, appellant argues that the trial court erred in refusing to charge the jury on the right of the occupants of the Stetler house to employ deadly force to protect their property.[13] Appellant testified at trial that immediately prior to the shooting, Robert Mendel entered the Stetler home wielding a baseball bat with which he knocked the television to the floor, and shouting "You're all going to get it now." Shortly thereafter, appellant heard shots fired in the house. These were the shots which killed Robert Mendel.

The Crimes Code provides:

§ 507. Use of force for the protection of property
(a) Use of force justifiable for protection of property.— The use of force upon ... the person of another is justifiable when the actor [reasonably] believes that such force is immediately necessary:

(1) to prevent or terminate an unlawful entry or other trespass upon land or a trespass against ... tangible movable property, if such land or movable property is ... in his possession ....

18 Pa.C.S.A. §§ 501, 507. However, at the time of this case § 507 contained the following limitation upon such use of force: "The use of deadly force is not justifiable under this section [§ 507] unless the actor believes that such force is necessary to prevent the commission of a *felony* in the dwelling." 18 Pa.C.S.A. § 507(c)(4)(ii) (emphasis supplied).[14]

In this case it was not reasonable for the occupants of the Stetler house to believe that Robert Mendel, in response to the attack which appellant and Edwin Meredith had just perpetrated against his wife, was about to commit a felony

---

**13.** The trial court did charge the jury on the use of deadly force in self-defense and for the protection of others.

**14.** We read § 507 on the use of force for the protection of property to apply exclusively to felonies against property. If an intruder were about to commit a felony against a person inside a dwelling, then the Crimes Code sections on self-protection and the protection of other persons would control, and these sections include the obligation to retreat, if possible, and the requirement that the actor not provoke the use of force against himself. *See* 18 Pa.C.S.A. §§ 505, 506.

against property in their house. The only crime which Robert Mendel may have committed was criminal mischief, and that crime is not a felony unless pecuniary loss in excess of $5,000 is sustained. *See* 18 Pa.C.S.A. § 3304. Since, as a matter of law, the members of the Stetler house were not justified in using deadly force against Robert Mendel, it was not error for the trial court to refuse the requested instruction.

Judgements of sentence affirmed.[15]

ROBERTS, J., filed a dissenting opinion.

NIX, J., filed a dissenting opinion.

ROBERTS, Justice, dissenting.

Because the prosecution impermissibly used a statement obtained from appellant in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), I dissent.

Following their preliminary investigation of the killing, the police took appellant and the other persons at the scene to the Police Administration Building for questioning. The record establishes that, although appellant and the others were told that they were "witnesses," appellant and the others were required to accompany the police to the stationhouse. Indeed, on cross-examination, an investigating officer acknowledged that no member of the group of so-called witnesses had been free to leave the company of the police.

---

**15.** Appellant also raises the following issues on this appeal: 1) that his rights under the Sixth and Fourteenth Amendments were violated by the trial court's refusal to permit his attorney to conduct the voir dire of the jury panel; 2) that the trial court erred in refusing to grant his motion for a mistrial after the Commonwealth twice attempted to use inadmissible evidence to impeach appellant; 3) that the trial court erred in striking as hearsay a response given by one of his witnesses; 4) that the trial court erred in admitting evidence of incidents which occurred prior to the night of the assault and shooting in which appellant himself had no part; 5) that the trial court erred in refusing to charge the jury that appellant's mere presence in the Stetler home during the shooting was not sufficient evidence to warrant conviction; and 6) that the trial court erred in allowing Dr. Halbert Fillinger to testify as an expert in the area of ballistics. We have carefully reviewed the record and have determined that these issues are without merit.

Thus, notwithstanding police representations that appellant and the others were only witnesses to the crime, the police imposed substantial limitations on the freedom of action of the group members.

The fact that at the suppression hearing appellant stated that he had believed that he was being treated as a witness until the close of police questioning does not compel a contrary conclusion. This record demonstrates that that treatment constituted a significant restraint on appellant's freedom of action. *Miranda* warnings, therefore, should have preceded interrogation, see *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977), and appellant must be granted a new trial.

NIX, Justice, dissenting.

The Supreme Court of the United States in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) set forth specific warnings to be given to individuals who are being subjected to "custodial interrogation." That Court defined "custodial interrogation" as questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of their freedom of action in any significant way. Commonwealth v. Meyer*, 488 Pa. 297, 412 A.2d 517 (1980); *Commonwealth v. McLaughlin*, 475 Pa. 97, 379 A.2d 1056 (1977); *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977); *Commonwealth v. Butler*, 454 Pa. 95, 309 A.2d 720 (1973); *Commonwealth v. Banks*, 429 Pa. 53, 239 A.2d 416 (1968). To conclude that appellant was not derived of his freedom of action in significant way is to ignore the record before us.[1]

1. The instant factual setting is clearly distinguishable from those cases where the individual voluntarily supplied information, *see, e.g., Commonwealth v. Brantner*, 486 Pa. 518, 406 A.2d 1011 (1979); *Commonwealth v. Boone*, 467 Pa. 168, 354 A.2d 898 (1975); *Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1974), or consented to a police request to go to the police headquarters to be interviewed. *See, e.g., Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980); *Commonwealth v. Peters*, 473 Pa. 72, 373 A.2d 1055 (1977).

Implicitly, the majority attempts to draw upon the distinction between the "investigatory" and the "accusatory" process. This distinction was made in *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but not carried over in the *Miranda* analysis. In footnote four (4) of the *Miranda* opinion, the Court stated the *Escobedo* decisive stage was the same as that set forth therein. The inference was that the focus requirement of *Escobedo* is satisfied by the nature of the detention.

As noted in *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the concern of the *Miranda* Court was to offset the coercive and compulsive aspect of custodial interrogation. While the police have a legitimate right to question those who may have knowledge of criminal activity, *Miranda v. Arizona, supra,* at 477, 478, 86 S.Ct. at 1629, 1630, they do not have the power to force answers to their inquiries. Thus whether the questioning is classified as "investigative" or "accusatory," it is immaterial where, as here, the individual is obliged to participate and the questioning occurs in the sterile and coercive police controlled setting.

The fact that police suspicion had focused upon the individual is not controlling, rather it is the nature and setting of the in-custody interrogation the police employ to elicit the desired information. *Beckwith v. U. S., supra.* Where the person has been placed in custody pursuant to an arrest, it is clear that the focus had also centered upon him. However, the *Miranda* definition of custodial interrogation is broader than the question of arrested suspects. Even absent a formal arrest, the *Miranda* concern is present where police initiate questioning concerning a crime or criminal activity and conduct that interrogation in a police controlled coercive setting. Such was the case here and appellant was entitled to the warnings.

I therefore dissent.