491 A.2d 111

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Anthony CORTEZ, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 26, 1984.

Decided April 18, 1985.

Reargument Denied July 2, 1985.

530

John W. Packel, Chief/Appeals Div., Jules Epstein, Asst. Defenders, for appellant.

Eric B. Henson, Deputy Dist. Atty., Sarah Vandenbraak, Asst. Dist. Atty., Gaele Barthold McLaughlin, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

Two police officers on routine patrol in the early hours of an empty, snowy February morning passed an alley behind residences in North Philadelphia. As the officers were passing they heard dogs barking as two men emerged from the alley. The officers stopped the men and asked if they lived on the alleyway. The men acknowledged that they did not and were unable to produce identification. Prior to further inquiry the officers "patted down" the appellant here, and found in an outer coat pocket the ubiquitous gun.

Arrested and charged with possession of a firearm, appellant was tried and convicted.[1] In his appeal here, he contends, as he did unsuccessfully below, that the stop and frisk by the police officers was unsupported by a reasonable suspicion. While we would not yield our right of passage on the public streets to the whim of every barking dog, there are circumstances that may for the protection of all require some small rites of such passage.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court laid down certain limited occasions when one's freedom to go where he will upon the public streets, may justify the small, at least to the innocent, inconvenience of a police inquiry.

[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

*Id.* at 30–31, 88 S.Ct. at 1884–85.

Dogs are vigilant of the small parcels of the world they call their own. They bark at mice and men, feel tremors in

1. Appellant was convicted in Philadelphia Municipal Court of carrying an unlicensed firearm upon the streets of Philadelphia, in violation of Sections 6106 and 6108 of the Pennsylvania Uniform Firearms Act, Act of December 6, 1972, P.L. 1482, No. 334, § 1 *et seq.*, 18 Pa.C.S. §§ 6106 and 6108. The Court of Common Pleas of Philadelphia denied his petition for certiorari and the Superior Court affirmed that denial. *Commonwealth v. Cortez,* 312 Pa.Super. 610, 460 A.2d 841 (1983).

the depths of the earth and seem to hear the shift of cobwebs. Their bark is not always, however, an alarm. Those they guard come to know the meanings of their bark; sift the bark at the stray cat, the home coming neighbor, and the echo of distant change.

In the dark of a snowy February morning, however, their bark, herald of two men emerging from an alley, is not without its reasonable suspicions. Those charged with everyone's protection cannot be faulted if they heed that bark and check its obvious cause. To do less under those circumstances is to unreasonably discount one of the most common experiences of men with dogs: dogs bark at strangers. Whether persons in an alley, past the midnight, are indeed strangers, harmless passersby, lost, ill, or bent upon more sinister errands, is so palpably a reasonable question, that not to seek its answer would be a dereliction of common experience, and for police officers a dereliction of their duty.

■ When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error. *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980); *Commonwealth v. Johnson*, 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975). *Cf. Commonwealth v. James*, 506 Pa. 526, 486 A.2d 376 (1985); *Commonwealth v. Hamlin*, 503 Pa. 210, 469 A.2d 137 (1983) (regarding the proper standard of review in a Commonwealth appeal.)

■ At the suppression hearing one of the arresting officers testified that he suspected a burglary had occurred or was going to occur in that alley, and he testified that he

felt the need to protect himself. Furthermore, he articulated the reasons for his suspicions: the time of night, the weather, the empty streets, the barking dogs, the inability of appellant to produce identification. The suppression hearing judge found these facts sufficient to justify the stop, and we detect no error in this determination.

In *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969) this Court held:

> [E]ven if probable cause to arrest is absent, [a] police officer may still legitimately seize a person ... and conduct a limited search of the individual's outer clothing in an attempt to discover the presence of weapons which might be used to endanger the safety of the police officer and others, *if* the police officer observes unusual and suspicious conduct on the part of the individual seized which leads him reasonably to conclude that criminal activity may be afoot and that the person with whom he is dealing may be armed and dangerous. (Emphasis in original.)

*Id.*, 434 Pa. at 158–159, 253 A.2d at 279. The acts of the police officers here were certainly consistent with these guidelines. We cannot demand of our police that they determine with one hundred per cent certainty that criminal activity is afoot or that a person is armed before they take protective steps. *Terry v. Ohio, supra,* does not require this and neither do prior decisions of this Court.

The order of the Superior Court is affirmed.

HUTCHINSON, J., joins the Majority opinion and files a separate concurring opinion.

FLAHERTY, J., files a dissenting opinion.

ZAPPALA, J., files a dissenting opinion.

HUTCHINSON, Justice, concurring.

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution require that the authorities act reasonably in seizing per-

sons or property. I read the majority opinion as simply holding that the police did act reasonably in investigating this situation and making a *Terry* stop, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), after the barking dog alerted them. The facts as set out by the majority show that conclusion is plainly correct and I therefore join the majority opinion.

FLAHERTY, Justice, dissenting.

Shortly after midnight on February 7, 1980 Philadelphia Police Officers McCarthy and Malandra were on patrol in an unmarked police vehicle. In the 1700 block of North 22nd Street the officers heard dogs barking in the back yards and decided to investigate. The weather was inclement and no one was on the streets. The officers observed two men emerge from the alley behind the houses in the 1700 block and walk across a vacant lot. Officer McCarthy exited the police vehicle and approached the two men in order to question them because he was suspicious that they may have been involved in a burglary or attempted burglary of these houses.

When Officer McCarthy approached the two men, he asked whether they lived on the block. They answered in the negative, and he then asked for identification. The man accompanying Cortez produced identification, but Cortez did not. Cortez told McCarthy his name and stated that he was on his way home. Officer McCarthy testified that he then frisked the outer clothing of the two men for his own protection. In the left front coat pocket of Cortez's coat McCarthy retrieved a loaded twenty-two caliber pistol.

Cortez was charged with carrying a firearm without a license, carrying a firearm on a public street or place, and possessing an instrument of crime. He was convicted of the first two offenses in Philadelphia Municipal Court, but acquitted of the last and was sentenced to a fifty dollar fine plus court costs of sixty dollars. Following conviction and sentencing, Cortez petitioned for certiorari in the Philadelphia Court of Common Pleas, alleging that the Philadelphia Municipal Court erred in not suppressing evidence against

him. Cortez's petition was denied and Superior Court denied the subsequent appeal in a *per curiam* memorandum opinion, Judge Popovich dissenting. We granted allocatur to decide whether, on the facts of this case, Officer McCarthy exceeded his authority under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) to make this investigatory stop and to conduct a self-protective frisk.

The Fourth Amendment applies to seizures of the person, even brief seizures short of traditional arrest. *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Moreover,

> " '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person,' ... and the Fourth Amendment requires that the seizure be 'reasonable.' " *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

*Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 361 (1979). Thus, the seizure of Cortez in the present case must be treated under a Fourth Amendment "reasonableness" analysis, albeit a Fourth Amendment analysis which the United States Supreme Court modified in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) as applied to brief investigatory stops. Prior to *Terry*,

> the Fourth Amendment's guarantee against unreasonable seizures of persons was analyzed in terms of arrest, probable cause for arrest, and warrants based on such probable cause.... Terry for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause. That case involved a brief, on-the-spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an "arrest."

*Dunaway v. New York*, 442 U.S. 200, 208–9, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824, 832–34 (1979). The *Terry* Court held that even this type of police intrusion must be tested by the Fourth Amendment's rule against unreasonable searches and seizures, but that

since the intrusion involved in a "stop and frisk" was so much less severe than that involved in traditional "arrests," the Court declined to stretch the concept of "arrest"—and the general rule requiring probable cause to make arrests "reasonable" under the Fourth Amendment to cover such intrusions. Instead, the Court treated the stop-and-frisk intrusion as a sui generis "rubric of police conduct," ibid. And to determine the justification necessary to make this specially limited intrusion "reasonable" under the Fourth Amendment, the Court balanced the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety.

*Id.*, 392 U.S. at 209, 99 S.Ct. at 2255, 60 L.Ed.2d at 833–34 (1979). Thus, under carefully defined circumstances, seizures which are substantially less intrusive than arrests may be conducted without a warrant and on the basis of a balancing test.

The manner in which this balancing was carried out in the *Terry* case is well defined in the Court's statement of its holding:

Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

392 U.S. at 30–31, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911. Thus, under *Terry*, when a police officer reasonably suspects that a person is involved in criminal activity, he may stop that person to conduct a brief investigatory questioning (which the suspect need not answer, Concurring Op. of Justice White in *Terry*, 392 U.S. at 34, 88 S.Ct. at 1886, 20 L.Ed.2d at 913), and if the officer also has reasonably concluded that the person whom he has momentarily stopped may be armed, he may conduct a limited frisk of the suspect's outer clothing in order to protect himself and others. Finally, if the officer finds a weapon pursuant to a valid *Terry* search, the weapon may be introduced into evidence against the possessor of the weapon.

In this case, the operative facts affecting the formation of the officer's reasonable suspicion of criminal activity are that the hour was late, the weather was inclement, no people were on the streets, dogs were barking, and two males were seen walking in the area where the dogs had barked.* Such facts will not support a forcible investigatory stop under *Terry*. Because citizens of the United States, absent extraordinary circumstances, are free to move about public places at their pleasure, even late at night and in

---

* The arresting officer's testimony was as follows:

Q. Could you tell the court the circumstances giving rise to this arrest?

A. Yes, sir. Your Honor, on February 7, 1980, at approximately twelve-twenty a.m., myself in company with my partner, Officer Malandra, were traveling eastbound on Montgomery Avenue, in the area of 22nd Street. My attention was attracted to the rear properties. . . .

Q. Could you describe the weather conditions that night?

A. Yes, it was very cold and it was snowing.

Q. Continue. What happened?

A. My attention was attracted to the rear properties in the 1700 block of North 22nd Street.

Q. Why? What caused your attention to go in that direction?

A. Because I heard several dogs barking. I stopped the truck and I observed two negro males exiting the rear alley of the 1700 block of North 22nd Street. I stopped to investigate and I asked both males if they lived there. Neither of them did, and I asked the defendant for identification. He couldn't produce any. So, for my own protection. . . .

cold, snowy weather, no reasonable suspicions of crime may be inferred from such movement. Similarly, the mere barking of dogs does not give rise to a reasonable belief that a crime may have been committed or attempted. Dogs chained in a back yard will often bark at anyone who passes through an alley, even a police officer. Finally, no reasonable inference of criminal activity arises from the fact that Cortez did not live in the neighborhood and was merely passing through on his way home. None of these facts, either in combination or in isolation, gives rise to a reasonable suspicion of criminal activity.

Since there was no basis for a reasonable belief that Cortez was involved in criminal activity, there were no grounds for a forcible stop in this case, and thus, there were no grounds for the frisk, for the right to search a suspect is incidental to the right to stop a suspect:

> As noted by Mr. Justice HARLAN in a concurring opinion in *Terry*, the right to "frisk" depends upon the reasonableness of a forcible stop to investigate a suspected crime.

*Commonwealth v. Anderson*, 481 Pa. 292, 297, 392 A.2d 1298, 1301 (1978). Because there was no right to search the person of Cortez, the product of that search may not be introduced into evidence. *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 454 (1963); *Commonwealth v. Pollard*, 450 Pa. 138, 299 A.2d 233 (1973).

This case and other similar cases ultimately raise the complex question of whether we can or should remain a free society or whether, because of the apparent exigent need to deter crime, the personal freedoms of ordinary citizens must finally be sacrificed in order that we might hold in check the criminals among us. While it is true that

> Q. Excuse me, officer, prior to this, what was going through your mind as you were getting the responses from these questions?
> A. I was investigating the possibility of a burglary.
> Q. What causes you to think this was a possible burglary?
> A. Because it was twelve-twenty a.m. It was very cold. It was snowing. I heard dogs bark in the rear yards and I saw two males exit the alley in the rear of occupied buildings.

police officers must be invested with reasonable powers to prevent crime and apprehend criminals, at the same time, under the constitution, the police may never be vested with the power to arbitrarily interfere with our constitutional right to move about freely. We must carefully consider the facts and circumstances in each case of this type with an alert eye cast to maintaining the precarious constitutional balance that exists between the interests of the state in deterring crime and the interests of the people in maintaining their freedom of movement.

Contrary to the majority, who views the police stop in this case as "palpably reasonable," I would hold that the stop was without reasonable basis as required by *Terry*—"unusual conduct which leads [the police officer] reasonably to conclude in light of his experience that criminal activity may be afoot"—and would reverse the order of Superior Court.

ZAPPALA, Justice, dissenting.

The broad sweep of the Majority's Opinion causes me to wonder whether the concepts of "probable cause" and "reasonable suspicion" retain any vitality in this Commonwealth, or whether, as it appears, law enforcement officers may now under the guise of protecting themselves and society stop any person who in the officers' judgment appears out of place.

My disagreement with the Majority lies in the application of the governing legal precept to the facts at hand; with the summary of facts, choice of applicable law, and interpretation of that law I have no quarrel. It is well-established that under the Constitutions of the United States and of this Commonwealth, in certain circumstances police may detain a person and conduct a limited precautionary search even in the absence of probable cause. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969). I find it ironic, however, that the Majority would cite *Hicks*, because in that case we suppressed the evidence, holding that the record was devoid of the necessary proof to establish the "reasonable suspicion" necessary to legitimate the stop and

frisk. We stated that "[t]he police must prove that *specific conduct* of the seized person, observed by them, *justified* and made reasonable *their belief that criminal activity was afoot and that the seized person was armed and dangerous.*" 434 Pa. at 160, 253 A.2d at 280 (emphasis added).

Even if the judicial imagination be stretched to allow the concession that the reasons given by the police officer here—the time of night, the weather, the empty streets, the barking dogs, the inability of appellant to produce identification—justified a suspicion that a burglary had occurred or was going to occur, there is absolutely no evidence upon which the officer can be said to have proven the reasonableness of his belief that the person was armed and dangerous. Images of peril conjured from detective novels and adventure films, though they might supply the element of suspicion, cannot suffice to supply the element of reasonableness. The Majority is satisfied to simply state that the officer "felt the need to protect himself" and, without objective analysis of whether the reasons given justified this subjective feeling, accedes in the conclusion that the officer's actions were proper *ipse dixit.* I cannot go along. In the pursuit of "law *and* order" we must not choose order at the expense of law.

I would reverse the Order of the Superior Court.